STATE of Minnesota, Respondent,

v.

Brian Patrick BEIER, Appellant.

No. 46947.

Supreme Court of Minnesota.

Feb. 17, 1978.

C. Paul Jones, Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, John A. Winters, County Atty., Crookston, for respondent.

TODD, Justice.

Defendant was found guilty by a district court jury of a charge of aggravated rape, Minn.St.1974, § 609.291, and was sentenced by the trial court to a maximum indeterminate term of 30 years in prison. On this appeal from judgment of conviction and

from an order denying a motion for a new trial, defendant's main contention is that the trial court erred in denying him a new trial when it was learned after trial that several of the jurors had been aware that additional charges were pending against defendant in connection with a different incident, one that resulted in the death of a young girl. Other issues raised by defendant relate to the propriety of the grand jury proceedings leading to his indictment in this case, the propriety of the prosecutor's closing argument, and the sufficiency of the evidence. We affirm.

The victim was a 16-year-old high school sophomore. The evidence indicates that early in the evening on Saturday, March 1, 1975, the victim and an 18-year-old girlfriend, Nashell Olmstead, were trying to find Nashell's boyfriend, Bill Peterson. Defendant, who knew Bill, agreed to give them a ride in his car to a party that Bill was believed to be attending. Although the victim had the use of her mother's car that evening, she did not have permission to drive it into the country where the party was being held. After driving the girls to the party and not finding Bill, defendant drove the girls to Bill's apartment where they found him. Defendant then agreed to give the victim a ride back to her car, and she was to return to Bill's apartment to pick up Nashell.

However, the victim testified that instead of driving her back to her car, defendant drove in the opposite direction into the country. When she asked him where he was going, he said he wanted to talk. She testified that he ignored her statement that her mother was going to wonder where she was and ignored her statement that he was scaring her. After going a couple miles, he stopped the car on a gravel road and got out, saying he was going to urinate. She testified that when he returned, he grabbed her and tried to kiss her, ignoring her pleas to leave her alone. When he told her to get in the back seat, she cried and screamed and told him to take her home. Finally, when he slapped her and ordered her to get in the back or he would kill her, she did, following the advice her mother had once given her that she should do what she was told if she was in a situation where violence was threatened. She testified that once she was in the back seat, defendant pulled down her jeans and pants, as well as his own, and forced himself upon her, achieving penetration.

She testified that after having intercourse with her, defendant told her he was a big football player and used to do this to all kinds of girls. She testified that nonetheless he repeatedly told her he was sorry. Still fearing defendant, the victim told him she would not tell anyone, and he replied that she better not and that no one would believe her anyhow. When it looked like he was not taking her back to town as she had understood he was going to do, she, referring to his repeated apologies, said, "Call me tomorrow and we will talk about it." She then wrote her telephone number on a piece of paper and gave it to him.

She testified that after defendant dropped her off she ran to her car, got in, locked the doors, and drove off, almost crashing into defendant, whose car was partially blocking the exit from the lot where she had parked her car. Once home, she told her mother what had happened, and her mother took her to the hospital. However, at the hospital the victim hysterically refused to let anyone, including the doctor, touch her. Unable to examine her, the doctor prescribed pills and, according to the victim, gratuitously advised her against calling the police, saying that rape defendants always get let off.

Nashell testified that the victim told her what had happened later that morning. She testified that she confronted defendant with this story at a bar a couple weeks later and asked him if he had raped her. She testified that he said he did not remember, that maybe he had and maybe he had not, but he did not think so.

Defendant, who called a number of character witnesses at trial, testified in his own behalf. He testified specifically that the victim agreed to go with him on a drive into the country and, after kissing him in the

front seat, crawling into the back seat and letting him pet her, she implicitly consented (by not protesting) to have intercourse with him. He denied threatening her or using any force. He also testified that she asked him to take her out the next night and wrote her phone number on a piece of paper so he could call her. He testified that when Nashell asked him if he had raped the victim, he denied it.

The issues on appeal are:

(1) Was there jury misconduct?

(2) Was there immunity from prosecution for an offense testified to at a grand jury hearing?

(3) Was there improper final argument?

1. The issue which has given us the greatest difficulty is the one relating to alleged juror misconduct. At the original date set for sentencing, defense counsel informed the court that he had just learned from one of the jurors that three of the other jurors had introduced into the deliberations a matter which was totally outside the evidence, specifically, the fact that defendant was awaiting trial on charges related to the death of a young girl.[1] Defense counsel added that, although there was no transcript of voir dire, he believed that these and the other jurors had answered "No" when asked if they knew anything about defendant. Confronted with defense counsel's charge, the trial court deferred sentencing until a Schwartz hearing could be held.

At the Schwartz hearing, three jurors testified. Mrs. Doris Ferguson admitted that although she had not informed the court at voir dire, she had known at that time of the pending prosecution of defendant in connection with the death of a girl. Asked if it had caused her to prejudice defendant, she said, "I'm sure it didn't" and she denied that the matter had been discussed by the jury although the jurors were aware of the possibility of another charge.

Mr. David Fisher testified that before being selected as a juror he had read a short newspaper article about a child molesting charge against defendant, and he added that the possibility of other charges against defendant had been mentioned during jury deliberations. Fisher, like Mrs. Ferguson, claimed that this knowledge had not affected him.

Mr. Joe DeRemer, the last juror questioned, testified that before being selected as a juror he had read an article about the death of a girl but could not remember if defendant's name had been mentioned. He added that if his name had been mentioned, it would not have meant anything to him. He admitted that the pendency of another prosecution of defendant, possibly related to the girl's death, was discussed. Like the others, he denied that this had affected him.

The trial court, after hearing the testimony of the three jurors, ruled that defendant had not shown that he was prejudiced by what happened, and the court then proceeded to sentence defendant. The court reaffirmed this ruling when it denied defendant's motion for a new trial.

■ It cannot be said as a matter of Federal constitutional law that defendant was denied due process. See, *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (upholding the conviction of a defendant in a case in which the jury improperly learned of defendant's extensive criminal record). However, the issue remains whether, in the exercise of our supervisory powers over the district court, we should grant defendant a new trial. For a number of reasons we have concluded that a new trial is unnecessary.

■ We start with the proposition that while pretrial publicity may jeopardize a

---

1. A month or two after the incident with which we are concerned, defendant tried to rape a young girl who ran away from him in a rural area and died after collapsing and falling on a muddy field. Defendant was tried on charges arising out of that incident in early 1976, after the trial in this case, and was found not guilty of third-degree murder and indecent liberties, but guilty of attempted sexual intercourse with a child. We affirmed that conviction in *State v. Beier*, Minn., 262 N.W.2d 707, filed February 3, 1978.

defendant's right to a fair trial by an impartial jury, no *presumption* of prejudice arises unless there is massive publicity surrounding the trial. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Stated differently, a defendant in a criminal case seeking reversal on appeal on this ground must show that he actually was prejudiced by the publicity.

In this case, there apparently was some pretrial publicity concerning the charges against defendant, both in this case and in the other one. One of the things a defendant can do if he believes that pretrial publicity has destroyed the possibility of a fair trial is to seek a change of venue. Rule 24.03, subd. 1, Rules of Criminal Procedure. The test is whether the publicity has created a reasonable likelihood that without a change of venue a fair trial cannot be had. Rule 25.02, subd. 3. Counsel moved for a change of venue in the other case against defendant, which was tried subsequently to the trial in this case, but it appears that he did not do so in this case. At least there is no mention of such a motion in defendant's brief, and we have not found any such motion in the file.

The next thing which a defense counsel can do to protect a defendant against the impact of potentially prejudicial pretrial publicity is to carefully question the prospective jurors at voir dire. Rule 26.02, subd. 4(2)(b), provides that "[w]henever there is a significant possibility that individual jurors will be ineligible to serve because of exposure to prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors." In order to successfully challenge a juror for cause under Rule 26.02, subd. 5, in a case involving pretrial publicity, the defendant must do more than elicit an admission from the potential juror that he has been exposed to pretrial publicity. The test is whether the potential juror exposed to such publicity demonstrates to the satisfaction of the court that he can set aside

preconceptions and render an impartial verdict. *United States v. Radetsky*, 535 F.2d 556 (10 Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976).

In this case, we do not have a record of the voir dire questioning, but it appears that the jurors were asked only general questions about whether they knew or had heard of defendant and whether they had any feelings of prejudice toward him. They were not asked any specific questions designed to determine if they had read or heard anything about the other incident or charge. If the jurors who had read newspaper accounts of the other charges against defendant had been properly questioned, counsel could have elicited the fact of their exposure to the publicity and could then have questioned them carefully in an attempt to determine whether, notwithstanding their exposure, they could render a fair verdict.

In cases such as this, where it is not until after the verdict that counsel learns of the jury's exposure to the publicity about defendant, the procedure which is followed is for counsel to request a so-called Schwartz hearing pursuant to Rule 26.03, subd. 19(6). If the court grants the defendant a hearing, then the jurors will be interrogated under oath and their testimony recorded. At this hearing, the defendant obviously must do more than demonstrate that jurors were exposed to publicity or rumors. He must show that the information not only made its way into the jury room, but infected the verdict.

Here, defendant was able to show that some of the jurors knew something about the other charges against defendant and that this information apparently was mentioned to other jurors during deliberation. However, defendant was unable to show that this knowledge of the charges played a significant role in influencing the jurors to convict him. It may be that if other jurors had been called, defendant may have been able to impeach the verdict. However, the other jurors were not called, and the trial court had to determine on the basis of the testimony of the three jurors whether there

was prejudice. Since the trial court heard the testimony of the three jurors and observed their demeanor, he was in a better position than we are to decide whether they were telling the truth when they testified that their knowledge of the other charges had not affected their thinking.

 If the evidence of defendant's guilt were not as strong as it is and if we had any doubt as to defendant's guilt, we might feel compelled to grant a new trial on the basis of what happened. However, we find that the trial court took this into account in denying the relief requested on this ground. The evidence was extremely strong, making it even less likely that the knowledge of the other charges played a significant role in influencing the jury to convict.[2]

2. The only issue relating to the grand jury is whether the indictment should have been dismissed as being the fruit of testimony compelled from defendant in violation of his Fifth Amendment privilege. Specifically, defendant contends that the waiver of rights form which he signed before testifying implied that he would be asked to testify only about the events related to the other incident.

The trial court stated in its memorandum in support of the order denying defendant a new trial that this motion was untimely, and we agree. See, *State v. Noland*, 298 Minn. 528, 214 N.W.2d 355 (1973), for the rule applying to cases arising before the effective date of the rules, and see Rule 17.06, subd. 3, and Rule 10.04, subd. 1, for the rule applying to cases arising after the rules became effective.

Also, a reading of the waiver form which defendant signed indicates that there probably is not any merit to defendant's contention. It appears that the waiver form was worded in such a way as to put defendant on notice that he might be questioned about

all prior misconduct, not just that involved in the other incident.

Beyond this, the record is inadequate to justify dealing with the issue.

 3. The only issue which we have not discussed is the matter relating to allegedly objectionable statements by the prosecutor in his closing argument. There were some statements by the prosecutor which were objectionable, but defense counsel presumably did not consider them to be objectionable because he did not object to them and, in fact, he made some of the same mistakes in his closing argument. For example, both the prosecutor and defense counsel referred to the presumption of innocence as not being a "cloak"[3] and both violated the rule against expressing their personal opinion on the issues.

Affirmed.

---

2. In fact, if we were to grant defendant a new trial, it appears that the state would seek to introduce the evidence about the other incident under one of the exceptions to the general rule excluding evidence of other crimes. While the prosecutor would not be permitted to introduce evidence of the death of the victim of that offense, the prosecutor might be permitted to introduce testimony about the sexual offense that caused the victim to flee.

3. As to the impropriety of arguing that the presumption is not a cloak to protect the guilty, see *State v. Thomas*, 307 Minn. 229, 239 N.W.2d 455 (1976).